IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


**CAED BRAWNER,**

    Petitioner,

vs.

                              CASE NO. 4:09cv112-SPM/WCS

**KENNETH S. TUCKER, Secretary,**
**Florida Department of Corrections,**[1]

    Respondent.

_____/


## REPORT AND RECOMMENDATION

This is an amended petition for writ of habeas corpus filed by Caed Brawner pursuant to 28 U.S.C. § 2254.  Doc. 5.  Petitioner challenges his convictions after a guilty plea for first degree murder and armed robbery with a firearm in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 2000-CF-1215A1.  *Id.*  Respondent filed an answer and the record  in paper form.  Doc. 14.  References herein to exhibits are to the record in paper form.  Petitioner filed a traverse.  Doc. 16.  Respondent notes that the petition was timely filed.  Doc. 14, p. 8.

---

[1] On August 24, 2011, Kenneth S. Tucker succeeded Edwin G. Buss as the Secretary of the Florida Department of Corrections, and is automatically substituted as Respondent.  Fed.R.Civ.P. 25(d).

**Background evidence**

The opening statement in the related trial of Timothy Thomas provides the essentials of what the prosecution expected to prove at Petitioner's trial. Timothy and Ulysses Thomas are cousins. Ex. G.[2] The victim, Jonathan Enrile and Petitioner lived in Cash Hall, a student housing facility, and Petitioner previously bought marijuana from Enrile. *Id.* When spring break arrived, a lot of the students had left Cash Hall. *Id.* On March 6, 2000, Timothy Thomas asked Ulysses Thomas if he wanted to do a "lick," and "jack" someone, that is, commit a violent crime against someone, and he said "sure." *Id.* Ulysses Thomas and Timothy Thomas approached Petitioner and ask where they could get marijuana. *Id.* The intent was to rob Enrile. *Id.* All three went to Enrile's room. *Id.* Petitioner had a loaded .25 caliber handgun and wore gloves. *Id.* Enrile had no marijuana, but they stole his watch. *Id.* Petitioner asked Timothy Thomas for his gun, and Timothy Thomas told him it was not a real gun. *Id.* Petitioner said "I've got to do him." *Id.* There seemed to be some evidence that Petitioner thought that the victim had seen his face and knew him. *Id.* Ulysses and Timothy Thomas argued with Petitioner not to do it, and Timothy Thomas walked out. *Id.* Petitioner asked Ulysses Thomas for a pillow. *Id.* Ulysses Thomas walked out, and a gunshot was heard. *Id.* Enrile was dead. *Id.*

In Petitioner's trial, jury selection went on for six days. Petitioner, 19 years old, was offered a plea agreement for a life sentence instead of death. He took it.

---

[2] The page numbers do not appear on the pages of this transcript at this point.

**Section 2254 Standard of Review**

"Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court. 28 U.S.C. §§ 2254(b)(1), (c)." O'Sullivan v. Boerckel, 526 U.S. 838, 839, 119 S.Ct. 1728, 1730, 144 L.Ed.2d 1 (1999). To properly exhaust remedies as required by § 2254(b), "the federal claim must be fairly presented to the state courts." Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (*citing* Picard). The petitioner also "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999); Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (applying this one complete round requirement to state collateral review process as well as direct appeal).

If a claim was not fairly presented but is procedurally barred from further state court review,[3] Petitioner must demonstrate cause for the default and actual prejudice, *or* demonstrate that the constitutional violation has probably resulted in conviction of an innocent person. Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115 L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991).

---

[3] Procedurally defaulted claims are considered technically exhausted because state court remedies no longer remain "available." The court therefore refers to "fairly presented" claims as having been *properly* exhausted, to distinguish them from claims exhausted by procedural default. See O'Sullivan, 526 U.S. at 848, 119 S.Ct. at 1734.

If the state court reached the merits of the federal claim, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d); Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); Ramdass v. Angelone, 530 U.S. 156, 120 S.Ct. 2113, 2119-20, 147 L.Ed.2d 125 (2000). "If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1400, 179 L.Ed. 2d 557 (2011); Holland v. Jackson, 542 U.S. 649, 652, 124 S.Ct. 2736, 2738, 159 L.Ed.2d 683 (2004) ("[W]hether a state court's decision was unreasonable must be assessed in light of the record the court had before it."). Further,

> . . . a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

§ 2254(e)(1); Fugate v. Head, 261 F.3d 1206, 1215 and n. 11 (11th Cir. 2001) (citation omitted).

For an ineffectiveness of counsel claim, the "clearly established" standard is set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under Strickland, "[a] convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been

the result of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066.  In determining whether counsel gave adequate assistance, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066.  Even if Petitioner can show deficient performance, he must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068.

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ——, ——, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010).  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve.  *Strickland*, 466 U.S., at 689–690, 104 S.Ct. 2052.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; see also *Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).  The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.  *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ——, 129 S.Ct. at 1420.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ——, 129 S.Ct. at 1420 .  Federal habeas courts must guard against the danger of equating

> unreasonableness under *Strickland* with unreasonableness under §
> 2254(d). *When § 2254(d) applies, the question is not whether counsel's
> actions were reasonable. The question is whether there is any reasonable
> argument that counsel satisfied Strickland's deferential standard.*

Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) (emphasis added); Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 739-740, 178 L.Ed.2d 649 (2011) (quoting this passage from Richter and applying it in the context of a guilty plea).

To be valid a guilty plea must represent a voluntary and knowing choice among available alternatives, so it must be made with reasonably effective assistance of counsel. The Strickland formula therefore applies to claims of ineffectiveness of counsel in the context of a guilty plea. Hill v. Lockhart, 467 U.S. 52, 58, 106 S.Ct 366, 370, 88 L.Ed.2d 203 (1985); Stano v. Dugger, 921 F.2d 1125, 1149 (11th Cir.), *cert. denied*, 502 U.S. 835 (1991) (citing Hill, other citations omitted). While the performance analysis is the same, the prejudice inquiry focuses on the effect of counsel's performance on the guilty plea process, and "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." 921 F.2d at 1150, *quoting* Hill, 467 U.S. at 59, 106 S.Ct. at 370.

**Legal Analysis**

    **Grounds One, Two, Four, and Five**

Ground one asserts that Petitioner's trial counsel was ineffective for failing to explain the elements of the offense prior to the guilty plea. Doc. 5, p. 6 on ECF. Ground two asserts ineffectiveness for failing to explained the planned defense. *Id.*, p.

9. Ground four alleges ineffectiveness for failing to file a motion to suppress Petitioner's confession. *Id.*, p. 14. Ground five asserts that Petitioner was denied due process when the trial court refused to let him withdraw his plea based upon evidence that was not discovered until May 4, 2004. *Id.*, p.18.

Petitioner presented these claims to the state trial court in his second Rule 3.850 motion. Ex. B, R. 351-353 (grounds two and one, respectively), R. 360 (ground seven), and R. 365 (ground eleven). The trial court held an evidentiary hearing. Exs. C, D (continuation), and E (oral argument). All of the grounds presented were rejected by the Rule 3.850 court in a written opinion. Ex. B, R. 415-421. The court discussed each claim and rejected it on the merits. *Id.* None of the claims were summarily rejected for failing to state a claim. *Id.*

Petitioner did not, however, raise grounds one, two, and four on appeal from denial of his Rule 3.850 motion. Ex. K. Those claims were not even mentioned.

Further, the only claim raised on appeal as to ground five was that the trial court erred by applying the wrong analysis to Defendant's newly discovered evidence claim. Ex. K, pp. 19-22. Petitioner argued that the correct standard was that applied to a motion for a new trial after trial and conviction, that "the evidence is of such a character that it would probably produce an acquittal on retrial." Johnson v. State, 904 So. 2d 400, 404 (Fla. 2005), *quoting*, Mills v. State, 786 So. 2d 547, 549 (Fla. 2001). Ex. K, p. 20, citing, *inter alia*, Barrow v. State, 940 So. 2d 1235, 1237 (Fla. 5th DCA 2006). This did not present a federal claim at all, but only a state claim. The federal claim is quite different.

> A guilty plea operates as a waiver of important rights, and is valid only if done voluntarily, knowingly, and intelligently, "with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

Bradshaw v. Stumpf, 545 U.S. 175, 183, 125 S.Ct. 2398, 2405, 162 L.Ed.2d 143 (2005).

At the time he entered his nolo contendere plea, Petitioner knew who shot the victim. The evidence that he later discovered, that another jail prisoner said that Ulysses Thomas had recanted and said that Petitioner had not shot the victim, was not exculpatory evidence that the prosecutor failed to disclose and was not discovered due to ineffectiveness of trial counsel, and thus does not implicate either Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) or Strickland.

> [A] plea's validity may not be collaterally attacked merely because the defendant made what turned out, in retrospect, to be a poor deal. See *Brady*, 397 U.S., at 757, 90 S.Ct. 1463; *Mabry v. Johnson*, 467 U.S. 504, 508, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984). Rather, the shortcomings of the deal Stumpf obtained cast doubt on the validity of his plea only if they show either that he made the unfavorable plea on the constitutionally defective advice of counsel, see *Tollett v. Henderson*, 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973), or that he could not have understood the terms of the bargain he and Ohio agreed to.

*Id.*, 545 U.S. at 186, 125 S.Ct. at 2407. In summary, Petitioner did not present a federal claim to the state court with regard to the new evidence claim, ground five.

The "one complete round" exhaustion requirement set forth in O'Sullivan v. Boerckel, *supra*, applies to post-conviction review as well, and a prisoner must appeal the denial of post-conviction relief in order to properly exhaust state remedies. Leonard v. Wainwright, 601 F.2d 807, 808 (5th Cir. 1979) (Florida prisoner must appeal denial of Fla.R.Crim.P. 3.850 relief to exhaust remedies); LeCroy v. Secretary, Florida Dept. of Corrections, 421 F.3d 1237, 1261 (11th Cir. 2005), *cert. denied*, 126 S.Ct. 1458 (2006)

(as Florida prisoner failed to properly exhaust claim on direct appeal or Rule 3.850 appeal, it was procedurally barred, citing Coleman); Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) ("Boerckel applies to the state collateral review process as well as the direct appeal process").

In Florida, on appeal of a denial of a post conviction motion *after an evidentiary hearing*, the movant must present specific arguments to support the points on appeal in his brief and a failure to do so waives the claims. Atwater v. Crosby, 451 F.3d 799, 809-810 (11th Cir. 2006). *See,* Sweet v. State, 810 So. 2d 854, 870 (Fla. 2002) ("because on appeal Sweet simply recites these [additional ineffectiveness] claims from his postconviction motion in a sentence or two, without elaboration or explanation, we conclude that these instances of alleged ineffectiveness are not preserved for appellate review."), *citing* Shere v. State, 742 So. 2d 215, 217 n. 6 (Fla. 1999) (a heading in the brief, asserting that trial court erred in summarily denying 19 of 23 claims raised in the Rule 3.850 motion, where no argument was made as to the grounds of error, was insufficient and claims were deemed abandoned) (citation omitted); Duest v. Dugger, 555 So.2d 849, 851-52 (Fla.1990) (reference to arguments raised in post conviction motion was insufficient; "[t]he purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues," so they were deemed waived).

Thus, Petitioner did not fairly present to the state appellate court the merits of grounds one, two, four, and five as presented in this petition. The claims are procedurally defaulted from further state court review.

Case No. 4:09cv112-SPM/WCS

Petitioner has not shown cause for his procedural default.  Petitioner had no right to counsel beyond his first appeal, and so any attorney error in the Rule 3.850 proceeding or the appeal therefrom cannot constitute cause for his default.  Coleman v. Thompson, 501 U.S. 722, 756-57, 111 S.Ct. 2546, 2567,115 L.Ed.2d 640 (1991).[4]  Nor has Petitioner shown that he is actually innocent to excuse procedural default.[5]  This court cannot reach the merits of grounds one, two, four, and five.

Before leaving these claims, I note that I denied Petitioner's motion for a stay so that he could return to state court to exhaust, finding that he had technically exhausted these claims, "whether properly so or by procedural default."  Doc. 24, p. 6.  It is now plain that exhaustion was by procedural default.

Moreover, the alleged "conflict" among Florida District Courts of Appeal concerned an appeal from denial of a Rule 3.850 motion that was mixed, where some claims were denied after an evidentiary hearing and some claims were denied as

---

[4] Moreover, before it can constitute cause for a default, the ineffectiveness of appellate counsel claim itself must be properly exhausted and not defaulted, which is not shown here.  Edwards v. Carpenter, 529 U.S. 446, 452-53, 120 S.Ct. 1587, 1591-92, 146 L.Ed.2d 518 (2000).

[5] The standard of proof for actual innocence as an excuse a procedural default is strict.

> To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.   Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

Schlup v. Delo, 513 U.S. 298, 324, 115 S.Ct. 851, 865, 130 L.Ed.2d 808 (1995).  A petitioner must show "that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." 513 U.S. at 327, 115 S.Ct. at 867.

Case No. 4:09cv112-SPM/WCS

facially insufficient. That is not the case here. All of Petitioner's claims were denied by the trial court after an evidentiary hearing. None were denied summarily. Moreover, the opinions cited by Petitioner have been altered, are in line with other Florida courts, and fully support this court's conclusion that issues not argued on the brief on appeal are waived. Norwood v. State, 67 So. 3d 270 (Fla. 2d DCA 2011), citing Walton v. State, 58 So. 3d 887 (Fla. 2d DCA 2011) (holding that where an appellant fails to raise a claim in his brief that the Rule 3.850 court erred in summarily rejecting a Rule 3.850 claim, the claim is waived on appeal).

**Ground Three**

Petitioner contends that his plea was involuntary because he was denied effective representation by his attorney. Doc. 5, pp. 10-13. He asserts that his attorney counseled him to enter a plea to avoid the death penalty. *Id.*, p. 10. He argues that there was not a reasonable probability that he would be sentenced to death if convicted. *Id.* He also contends that his attorney improperly appealed to Petitioner's religious beliefs. *Id.* He alleges that his attorney, a Christian minister, told him it would be a sin to go to trial because it would hurt the victim's family members by subjecting them to the emotional trauma of a trial and by subjecting his own sister to the knowledge that he was on death row. *Id.*, pp. 10-11. He asserts that his attorney was more interested in serving as his spiritual advocate than as his legal advocate. *Id.*, p. 11. He asserts that his attorney belongs to an advocacy group that believed offenders must take responsibility for their crimes and accept the punishment the State offers them. *Id.*, fn. 2. He contends that this constituted a constructive denial of counsel, and that he need not show prejudice to the outcome. *Id.*, pp. 11-12. He also contends that his will was

unfairly overcome by Smith's tactics.  *Id.*, p. 12.  He contends that co-counsel Cummings heard Smith make these comments, and walked away, leaving him with her. *Id.*  He argues that Smith was opposed to the death penalty, and viewed life in prison as a victory, but it was her victory, not Petitioner's victory.  *Id.*  Respondent agrees that Petitioner exhausted state court remedies as to this claim.  Doc. 14, p. 12.

>The trial court denied this claim, reasoning:
>
>Defendant claims counsel Melodie Smith improperly appealed to Defendant's religious beliefs to convince him to accept the state's plea offer.  She was second chair on this death penalty case.  She was an ordained minister.  She was initially hired by the family.  After Greg Cummings was appointed as trial counsel, Mr. Cummings, at the request of the family and Ms. Smith, requested and received an order appointing her second chair.  Greg Cummings was to handle all trial preparation and strategy.  *Ms. Smith was to prepare and handle all death penalty phase issues.*  Defendant claims Ms. Smith was ineffective by referring to religion to persuade him to enter a plea.  *Defendant knew Ms. Smith was an ordained minister, as did Defendant's mother*.  His own motion alleges Ms. Smith "switched hats", to talk to him as "a woman of faith", not as his lawyer.  Defendant had full and fair opportunity to consult with his mother and father regarding any decision to plead, regardless of his motivations.  He was of legal age to make a competent decision to plead.  He was mentally competent as well.  The Court finds Defendant to be very intelligent and well-spoken.  Suffice it to say *Defendant was entitled to consider or to reject the religious viewpoint of Ms. Smith.  Coincidentally, trial counsel, Greg Cummings, also was of the legal opinion that it was in Defendant's best interests to plead*.  He insured Defendant had access to his mother and father before making any decision. Mr. Cummings insured that Defendant knew that the decision was his alone to make, regardless of the opinions of others.  There were ample reasons to support this advice.  *There were aggravating circumstances to be argued such as the crime was for pecuniary gain or to rob, that it was an execution-style murder to eliminate a witness, and the murder was cold, calculated, and premeditated*.  There were mitigators to argue as well, and Mr. Cummings advised Defendant that there was little chance that the death penalty would be imposed, based on his experience.  *But, however slim the chance for the death penalty, he was of the opinion that there was no realistic chance of avoiding a life sentence, even if Defendant was convicted of lesser charges*.  Therefore, to accept life without the possibility of death, was preferred over the slim risk of death when the

> likelihood of at least a life sentence existed regardless.  This was a reasonable professional opinion.  *The Court finds Defendant knew the difference between a legal predicament and a religious predicament.  He understood Ms. Smith was ordained, that she did not handle the trial proceedings, and that her legal advocacy role was limited only to death penalty issues.  The decision to initially hire, and then have appointed, Ms. Smith, was at the request of Defendant, and he was always fully aware of her strong religious views, which is the likely reason his family, with his approval, hired her in the first place.  If any religious motivation was a consideration, it was personal to Defendant.  It forms no basis to set aside a legal plea. Ms. Smith's testimony on this subject reinforces this Courts finding that no improper force or threats were employed by her.*

Ex. B, R. 417-419 (emphasis added).

Melody Smith testified at the Rule 3.850 hearing.  Ex. D, p. 3.  She testified that she first obtained a degree from Harvard divinity school and then a law degree, and had been an attorney for 12 years.  *Id.*, pp. 4-6.  She is associated with Riverside Church in New York City, and has devoted her legal career to post conviction and death penalty work.  *Id.*, p. 5.  She is a minister for the United Church of Christ.  *Id.*, p. 6.  Smith was hired by Petitioner's family, and Greg Cummings remained as lead counsel.  Ex. C, p. 25.

The plea offer and entry of the plea came after six days of jury selection, but the jury had yet to be selected.  Ex. D, p. 22.  Smith said that said that she interviewed 130 potential witnesses for the penalty defense for Petitioner.  Ex. D, p. 10.  She sent out subpoenas for 21.  *Id.*, p. 11.  She felt that she was very prepared for the penalty phase of the case.  *Id.*, p. 14.  She also said that some of the potential witnesses, she believed, would not support Petitioner once they learned the facts of the case.  *Id.*, p. 27. She said Petitioner and his family might have found it difficult to deal with their lack of support.  *Id.*

Smith denied that she had ever told a client that it was wrong to go to trial.  *Id.*, p. 14.  She denied telling Petitioner that it was a sin to go to trial.  *Id.*, pp. 25, 44-45.  She admitted that she told Petitioner that harming other people was sinful.  *Id.*, p. 45.  She said that Petitioner engaged her in a lot of religious discussions, more than she wanted to do, and "did a lot of Bible babble and a lot of quoting scripture out of context."  *Id.*  She denied that she served as Petitioner's spiritual advisor, and insisted that her role was only as a lawyer.  *Id.*, p. 24.  She denied that she ever said to Petitioner that she was talking to Petitioner as a minister and not as a lawyer.  *Id.*, p. 47.

Greg Cummings testified that on the sixth day of jury selection, the day when Petitioner accepted the plea offer, Smith started talking "about Jesus" to Petitioner.  Ex. C, pp. 69-70.  He said that Smith and Petitioner "had an ability to talk to each other," and Cummings was not offended.  *Id.*, p. 70.  He said that Smith made some comments about sin, but he said she did not tell Petitioner that it would be a sin to go to trial.  *Id.*  He said he did recall that Smith said it would be a sin to put "the family through this, your family, their family, whichever family she was talking about," and he thought she was referring to the penalty phase.  *Id.*  Cummings said he was not that much of a religious person, and it was not something he would do, and he said he told Petitioner, "it was something I had never heard before, I was like, you know, this – it's not right.  It's not wrong.  I just haven't heard it that way."  *Id.*, pp. 71-72.

At the plea colloquy on July 1, 2003, Petitioner told the court that the plea agreement described by Cummings was the same one he understood was supposed to take place, that he was pleading no contest to counts one and two, that he would be sentenced to life without parole on both counts, and the state would dismiss count

three.  Ex. B, R. 343-344.  He said he understood that there would not be a trial, and the waiver of a trial was his own decision.  *Id.*, R. 345.  He said he understood he was giving up an appeal as well.  *Id.*, R. 346.  He said he had had a chance to talk "pretty thoroughly" with his lawyers and with his mother, and did not need more time to consult with them.  *Id.*, R. 347.  He said he was satisfied with both of his lawyers.  *Id.*

In summary, the court found as fact that despite the fact that he was 19 years of age, Petitioner was intelligent, knew the difference between his legal problem and his spiritual problem, and he and his family knowingly hired Smith as his lawyer because she had strong religious beliefs about the death penalty.  The court found as fact that if Petitioner was motivated to plead no contest due to spiritual reasons, it was personal to him and not a basis to set aside the plea.  The court also referred to the testimony of Smith as support for its conclusion that Smith did not use improper force or threats, which was an implicit rejection of Petitioner's claim that Smith told him it would be a sin to go to trial.

Petitioner's arguments to this court all go to issues of credibility of the witnesses at the Rule 3.850 hearing.  Doc. 16, pp. 13-37, especially pp. 34-37.  He points to his own testimony and argues that the testimony of Smith and Cummings supports his testimony.  This is insufficient.

> [A] determination of a factual issue made by a State court shall be
> presumed to be correct. The applicant shall have the burden of rebutting
> the presumption of correctness by clear and convincing evidence.

§ 2254(e)(1).  Further, Petitioner must show that the trial court's decision has  "resulted in a decision that was based on an *unreasonable* determination of the facts in light of

the evidence presented in the State court proceeding."  § 2254(d)(2).  Petitioner has not satisfied these standards.

The decision whether to forego a trial and plead guilty is intensely personal for a defendant, and it is not surprising that spiritual and family considerations played a part in Petitioner's decision to plead no contest.  Petitioner could distinguish between legal and spiritual issues.  Were he to go to trial and be convicted, Petitioner faced a possible death sentence.  If convicted, Petitioner's family and the victim's family would have been subjected to intense emotions during the guilt and penalty phases of the case.  Petitioner's plea avoided that.

Further, both of Petitioner's lawyers stood ready to try the case, and Petitioner knew it.  Petitioner also knew that his two lawyers had different roles.  Smith was there only for the penalty phase, and Cummings was in charge of the guilt phase.  Petitioner knew that he should rely upon the assessment of Cummings as to the likelihood of conviction.  Cummings testified at the Rule 3.850 hearing that:

> And the biggest problem we had with that [the obligation of the State to prove intent], and I started out with the problem, is that Mr. Brawner had admitted to the police that he had gone there and admitted that he was carrying a gun.  So the biggest problem in dealing with the fact that he had a firearm was, what was his intent?  Why was he carrying that firearm?
>
> If a robbery takes place, certainly it would be easy for a jury to infer that he was there knowing what was going to go on, whether he did or not.  That wasn't even an issue there. . . .
>
> The principle theory was one of the reasons I thought they could convict him of robbery. . . .

Ex. C, p. 57.  He also said that a co-defendant, Ulysses Thomas, was going to testify against Petitioner and that Petitioner went to the apartment wearing gloves, though he

must have taken them off inside because Petitioner's fingerprint was found on the inside door knob.  *Id.*, pp. 57-58.  Cummings also testified that a piece of paper was found in Petitioner's pants during a search of his residence that contained the rap lyrics, "I Nygo Cable (phonetic) were willing and able to break up weed with my gun on the table."[6]  *Id.*, p. 60, 63.  Cummings testified that he had been trying for three years to persuade the prosecutor to offer a life sentence for a plea, and he said that he told Petitioner repeatedly that "they would convict him probably of the robbery and that robbery could carry with it a life sentence."  *Id.*, p. 66.  He said: "And I probably did tell him, I don't believe Judge Hall would have any difficulty giving you life, having dealt with him for 20 years."  *Id*.  Petitioner has not shown that the advice he received from Cummings was ineffective assistance of counsel as defined by Strickland, and plainly it was not.  Petitioner joined the other two with intent to commit a violent crime against the victim, if only robbery, and he had a gun.

> "All pleas of guilty are the result of some pressures or influences on the mind of the defendant."  *Schnautz v. Beto*, 416 F.2d 214, 215 (5th Cir. 1969).  A defendant cannot complain of coercion where his attorney, employing his best professional judgment, recommends that the defendant plead guilty.  *See id.*; *Anderson v. Henderson*, 439 F.2d 711, 712 (5th Cir.1971); *United States v. Jones*, 392 F.2d 567, 569 (4th Cir.), *cert. denied*, 393 U.S. 882, 89 S.Ct. 186, 21 L.Ed.2d 156 (1968).

United States v. Buckles, 843 F.2d 469, 472 (11th Cir. 1988), *cert. denied*, 490 U.S. 1099 (1989).

---

[6] Cummings did not think this note was "that big of a deal," he thought it was not admissible in the guilt phase, and he believed that Ulysses Thomas, who would testify for the State, had a lot of explaining to do about similar rap lyrics associated with him.  *Id.*, pp. 62-64.

Thus, the Rule 3.850 court's ruling was not an unreasonable application of the Strickland standard of ineffectiveness of counsel and, more relevant, there is more than a "reasonable argument that counsel satisfied Strickland's deferential standard." Richter, *supra*. Consequently, Petitioner has not shown that the trial court's ruling on this claim of ineffectiveness has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1) and (2). Thus, ground three affords no relief.

**Certificate of Appealability**

Section 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. § 2254 Rule 11(b).

I find no substantial showing of the denial of a constitutional right. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04, 146 L.Ed.2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, I recommend that the court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." The parties shall make any argument as to whether a certificate should issue by objections to this report and recommendation.

Case No. 4:09cv112-SPM/WCS

**Conclusion**

Accordingly, it is **RECOMMENDED** that petition for writ of habeas corpus filed by Caed Brawner pursuant to 28 U.S.C. § 2254, challenging his conviction for first degree murder and armed robbery with a firearm in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 2000-CF-1215A1, be **DENIED WITH PREJUDICE**, and that a certificate of appealability be **DENIED** pursuant to § 2254 Rule 11(a).

**IN CHAMBERS** at Tallahassee, Florida, on November 1, 2011.


                              s/    William C. Sherrill, Jr.
                              **WILLIAM C. SHERRILL, JR.**
                              **UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**